UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ADVOCATES FOR THE WEST,<br><br>    Plaintiff,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE, a Department of the United States,<br><br>    Defendant. | Case No. 1:17-cv-00423-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. OVERVIEW

Pending before the Court are cross Motions for Summary Judgment filed by the parties. Dkts. 8, 12. After holding oral argument, the Court took the motions under advisement. Upon review, the Court now issues the following decision DENYING Plaintiff Advocates for the West's ("Advocates") Motion for Summary Judgment (Dkt. 8) and GRANTING Defendant United States Department of Justice's ("DOJ") Motion for Summary Judgment (Dkt. 12).

## II. BACKGROUND

In the present suit, Advocates allege that DOJ has violated—and continues to violate—the Freedom of Information Act ("FOIA") by unlawfully withholding 12 legal memoranda prepared by DOJ's Office of Legal Counsel ("OLC") regarding the President

of the United States' authority to alter national monuments under the Antiquities Act of 1906.

On or about February 6, 2017, Advocates submitted a FOIA request to DOJ in hopes of obtaining certain records related to this topic. This original request was extremely broad. Through negotiation with DOJ, Advocates agreed to narrow the scope of its request on two occasions, and ultimately sought only "responsive records located in OLC's database of final legal advice" concerning certain national monuments and the President's authority to enlarge, shrink, or modify said monuments.

On May 9, 2017, DOJ responded to Advocates by stating that it had identified 38 responsive records. That same day, DOJ released 26 of the 38 records in full, but informed Advocates that it would not be releasing the remaining 12 records pursuant to FOIA "Exemption 5."

Advocates requested more information, or justification, for withholding the 12 documents. DOJ responded that ten of the records were OLC "Form and Legality Memoranda" ("F&L Memos") and two of the records were "File Memoranda Recording Oral Legal Advice ("File Memoranda").

Unsatisfied, Advocates filed an administrative appeal with DOJ on or about July 17, 2017, arguing that OLC did not provide legally sufficient descriptions of the withheld records, nor adequate justification for its purported exemption to disclosure under FOIA Exemption 5. DOJ denied the appeal.

On October 12, 2017, Advocates filed the instant suit under FOIA with a single cause of action: "Unlawful Invocation of FOIA Exemption Five." Advocates now move

for summary judgment on the basis that DOJ and/or OLC has no reasonable justification for withholding the 12 records at issue and that FOIA Exemption 5 does not apply. Advocates ask the Court to rule in its favor and immediately order DOJ to turn over the records. DOJ filed a cross-motion for summary judgment alleging that it does have legally sufficient reasons for withholding the records under three different privileges. DOJ urges the Court to rule in its favor and allow the withholdings to stand.

### III. LEGAL STANDARD

#### A. *Summary Judgment*

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). In considering a motion for summary judgment, this Court must "view[] the facts in the non-moving party's favor." *Id.* To defeat a motion for summary judgment, the respondent need only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in [his or her] favor." *Id.* (citation omitted). Accordingly, this Court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The respondent cannot simply rely on an unsworn affidavit or the pleadings to defeat a motion for summary judgment; rather the respondent must set forth

the "specific facts," supported by evidence, with "reasonable particularity" that precludes summary judgment. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

The standard applicable to motions for summary judgment do not generally change if the parties file cross motions. *See, e.g.*, *Cady v. Hartford Life & Accidental Ins., 930* F. Supp. 2d 1216, 1223 (D. Idaho 2013). However, the Court must evaluate each party's motion on its own merits. *Fair Housing Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

## B.  Freedom of Information Act

FOIA requires federal agencies to make government records available to citizens upon request, subject to certain exemptions. *See* 5 U.S.C. § 552(a)(3)(A); § 552(b). "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978) (internal citation omitted).

While FOIA is intended to promote government transparency, FOIA exemptions are "intended to have meaningful reach and application." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989). To that end, Congress has recognized that "public disclosure is not always in the public interest," *C.I.A. v. Sims*, 471 U.S. 159, 167 (1985), as "legitimate governmental and private interests could be harmed by release of certain types of information," *F.B.I. v. Abramson*, 456 U.S. 615, 621 (1982). Accordingly, Congress has sought to reach a "workable balance" between the public's right to know

and the government's need to protect confidential information. *Manna v. U.S. Dep't of Justice*, 51 F.3d 1158, 1163 (3d Cir. 1995) (quoting *John Doe Agency*, 493 U.S. at 152).

The agency resisting public disclosure has "the burden of proving the applicability of an exception." *Minier v. Central Intelligence Agency*, 88 F.3d 796, 800 (9th Cir. 1996) (citing 5 U.S.C. § 552(a)(4)(B)).

FOIA contains nine statutory exemptions to full disclosure, which "must be narrowly construed." *Milner v. Dep't of the Navy*, 562 U.S. 562, 565 (2011). The only one relevant in this case is Exemption 5, which permits agencies to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).

In order for an agency to properly withhold a document under Exemption 5, "a document must . . . satisfy two conditions: its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). The exemption applies to generally recognized common law privileges against disclosure, such as the attorney-client, deliberative process, and presidential communication privileges. *Id.*; *see also Carter v. Dep't of Commerce*, 307 F.3d 1084, 1088 (9th Cir. 2002).

Summary judgment is the procedural vehicle by which most FOIA actions are resolved. *See Assembly of State of Cal. v. U.S. Dep't of Commerce*, 968 F.2d 916, 919 (9th Cir. 1992).

In FOIA cases, "[t]he agency may meet its burden by submitting a detailed affidavit showing that the information 'logically falls within one of the claimed exemptions.'" *Minier,* 88 F.3d at 800. An agency may also meet its burden by producing a *Vaughn*[1] index. *Reliant Energy Power Generation, Inc. v. F.E.R.C.*, 520 F. Supp. 2d 194, 200 (D.D.C. 2007). A *Vaughn* index, with accompanying declaration, ordinarily "identifies each document withheld, the statutory exemption claimed, and an explanation of how disclosure would damage the interest protected." *Schiffer v. F.B.I.*, 78 F.3d 1405, 1408 (9th Cir. 1996). The "purpose of the index is to afford the FOIA requester a meaningful opportunity to contest, and the district court an adequate opportunity to review, the soundness of the withholding." *Fiduccia v. U.S. Dep't of Justice*, 185 F.3d 1035, 1042 (9th Cir. 1999) (internal quotation marks omitted).

## IV. ANALYSIS

DOJ outlines that under FOIA Exemption 5 it is claiming three privileges for its refusal to release each of the 12 records at issue. Those privileges are the presidential communications privilege, the deliberative process privilege, and the attorney-client privilege. The Court will address each privilege in turn. Following that discussion, the Court will analyze two theories proffered by Advocates that the documents lost their privileged status (assuming arguendo it existed in the first place) because of actions taking by DOJ, OLC, the President, and/or other senior advisors. As a threshold matter, however, the Court must discuss the sufficiency of DOJ's *Vaughn* index.

---

[1] This term comes from *Vaughn v. Rosen,* 484 F.2d 820 (D.C. Cir. 1973).

*1. Vaughn Index*

Although DOJ did not originally supply Advocates with a *Vaughn* index, it has done so now. Dkt. 18-1, at 4-7.[2] While a *Vaughn* index is not required by statute—or any other mechanism—an agency claiming an exemption cannot carry its burden by just relying on conclusory or generalized assertions of privilege and a *Vaughn* index has become the accepted "privilege log" in FOIA cases. *See Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980)*; Nat'l Parks & Conservation Ass'n v. Kleppe*, 547 F.2d 673 (D.C. Cir. 1976)*; Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242 (D.C. Cir. 1977)*; Vaughn v. Rosen,* 484 F.2d 820 (D.C. Cir. 1973). In its *Vaughn* index, DOJ outlines the records it seeks to withhold from disclosure and why. Records 1 and 10 are both File Memoranda. These are essentially memoranda that memorialize legal advice DOJ orally gave to the White House Counsel's Office and the Council on Environmental Quality. *Colborn Decl.,* Dkt. 12-3, ¶14. The remaining ten records are F&L Memos. OLC drafts F&L Memos to advise the President regarding—as the name indicates—the form of a proposed presidential proclamation and its legality. *Id.* at ¶ 15. In other words, these F&L Memos include legal advice.

The Court will not include the whole index here, but it is helpful to see how DOJ structured its index, so the Court provides the first two index entries for illustrative purposes. As shown below, DOJ first listed the date each record was created, followed by the record's author. Next, a brief description of the particular record is given. The two

---

[2] DOJ first submitted this index as Docket 12-4. However, Advocates noted an error with the filing. DOJ fixed the error and resubmitted the index as Docket 18-1, Exhibit A.

File Memoranda (records 1 and 10) have the same general description as shown below for record 1 and the other ten F&L Memos have the same general description as shown below for record 2.[3] Finally, DOJ lists the privileges it claims as to each record under FOIA Exemption 5.

| Doc. | Date | Author(s) | Description | Exemption |
|------|------|-----------|-------------|-----------|
| 1 | July 23, 2008 | John P. Elwood, Deputy Assistant Attorney General ("DAAG"); Daniel Koffsky, DAAG; Steven P. Lehotsky, Attorney-Adviser ("AA") | Memorandum to File recording legal advice provided to the Office of the Counsel of the President regarding, among other things, the authority of the President of the United States under the Antiquities Act of 1906 | (b)(5): deliberative process privilege ("DPP"), attorney-client privilege ("ACP"), presidential communications privilege ("PCP") |
| 2 | Oct. 24, 2011 | Virginia A. Seitz, Assistant Attorney General | Memorandum to the President regarding the form and legality of a proposed presidential proclamation. Contains legal advice to the President and memorializes confidential communications with executive branch agency officials and senior advisers to the President and legal advice provided to those officials in the course of reviewing the proposed proclamation. Includes a cover letter to the President re the same, and the draft proclamation. | (b)(5): DPP, ACP, PCP |

Dkt. 18-1, at 4.

Advocates take issue with DOJ's index, namely its lack of specificity in regards to the recipients of the records, as well as its "boilerplate" descriptions.

In support of its position that its index is sufficient, DOJ relies primarily upon Ninth Circuit cases. In support of its position that the index is lacking specificity, Advocates rely primarily upon cases from the D.C. Circuit. The Ninth Circuit's decisions are binding upon this Court; however, the D.C. Circuit has dealt with the majority of FOIA cases over the years and federal courts across the country give great deference to its authority and analysis in this particular area of law.

---

[3] There are two or three slight variations in the index entries, none of which are particularly relevant or worth specifically drawing out.

As noted, there is no set formula for a *Vaughn* index. *See Fiduccia,* 185 F.3d at 1042. Under FOIA, an agency simply has to "notify the person making such request of such determination and the reasons therefor." 5 U.S.C. § 552(a)(6)(A)(i)(I). The Ninth Circuit has interpreted this phrase to require the responding agency to "provide enough information, presented with sufficient detail, clarity, and verification, so that the requester can fairly determine what has not been produced and why, and the court can decide whether the exemptions claimed justify the nondisclosure." *Fiduccia*, 185 F.3d at 1043; s*ee also Yonemoto v. Dep't of Veterans Affairs*, 686 F.3d 681, 688 (9th Cir. 2012).

In the final analysis, "an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Hamdan v. U.S. Dep't of Justice*, 797 F.3d 759, 774 (9th Cir. 2015) (citations omitted). "If the affidavits contain reasonably detailed descriptions of the documents and allege facts sufficient to establish an exemption, 'the district court need look no further.'" *Lane v. Dep't of Interior*, 523 F.3d 1128, 1135-36 (9th Cir. 2008) (citation omitted).

Advocates object to the fact that DOJ has not listed a specific recipient for each of the records in its index. While the law does not require DOJ to list this information, the Fourth Circuit has observed that "where the list fails to identify either the author or its recipient, those persons' relationships to the decisionmaking process cannot be identified and it becomes difficult, if not impossible, to perceive how the disclosure of such documents would result in a chilling effect upon the open and frank exchange of opinions

within the agency." *Ethyl Corp. v. U.S. EPA*, 25 F.3d 1241, 1250 (4th Cir. 1994).[4]

Advocates assert that DOJ must provide this information; otherwise, its *Vaughn* index is

deficient. Along this same vein, Advocates claim that knowing the persons or entities

furnished with the records is necessary to determine whether DOJ has waived any

privileges.

The Court notes that while the role of the *Vaughn* index in enabling the adversary

process to function in FOIA cases is universally recognized, there are not strict

requirements, nor are *Vaughn* indices even required in every case. *See Minier,* 88 F.3d at

804; *Wiener v. F.B.I.,* 943 F.2d 972, 978 n.5 (9th Cir. 1991). Here, DOJ has provided a

*Vaughn* index and accompanying affidavit. As shown above, DOJ has included numerous

details about the records it seeks to withhold. The accompanying Affidavit of Paul

Colborn[5] expounds upon the *Vaughn* index. Advocates seek more details, but were an

---

[4] Advocates reliance on *Ethyl Corp.* is understandable. However, it is not binding upon this Court, nor does it stand for the exact proposition Advocates assert. In saying that a *Vaughn* index is incomplete when it fails to identify *either* the author or recipient, it seems DOJ has actually complied with the holding in *Ethyl Corp.* because, while it is true that DOJ did not list specific recipients, it did listed the various authors of the records. Advocates also cite numerous lower Courts from within the Ninth Circuit for this same proposition—that failure to include recipients is renders an index incomplete. The Court will not list all of the cases for brevity. However, in those cases—as above—the Courts did not single out the "recipients" category as a fatal deficiency, but included it in various lists of other deficiencies within index submissions. Therefore, to say that the *Vaughn* indices in all those cases failed solely because the agencies failed to list the recipients is not completely accurate. It may have been a contributing factor, but was not the sole cause of error. *See, e.g., Coleman v. Schwarzenegger*, C01-1351 TEH, 2008 WL 2732182, at *1 (E.D. Cal. July 8, 2008) (concluding that a *Vaughn* index lacking "key information, such as the author, recipient, or date of creation of the document" was insufficient).

[5] Paul Colborn is a Special Counsel in the Office of Legal Counsel of the Department of Justice and his declaration accompanies DOJ's *Vaughn* index. In his affidavit, Colborn explains in greater detail the role and function of OLC and the various records at issue.

index to contain every detail, it would to some degree defeat the whole purpose of withholding. DOJ's submissions are entitled a presumption of good faith, *United States Dep't of State v. Ray,* 502 U.S. 164, 179 (1991), and while DOJ *could* have added more details, it has provided sufficient information here to "permit the adversarial process to function." *See Wiener,* 943 F.2d at 978 n.5.

In regards to the wavier of privilege argument, the Court will address this in the sections below. Nevertheless, the Court notes that a *Vaughn* index has never been the place to list all who eventually see, or pass along, a particular document. Were DOJ to list an individual as a recipient who is outside of the President's "inner circle," such listing *could* destroy certain privileges. However, DOJ has stated since the beginning of this case that all of the documents went to the President and/or his senior advisors and staff—all of whom are covered under the privileges asserted. Speculation as to possible waiver does not require DOJ to list individual recipients in its *Vaughn* index.[6]

Second, Advocates take issue with the lack of a specific description for each record as well as the lack of details concerning how the various privileges apply to each record. Advocates would like to see the specific name of the national monument or decision at issue listed, as well as the President's decision-making process, and the role

_____

[6] As the Court will discuss in the section regarding the presidential communications privilege, that privilege is broad enough to encapsulate the records here, covers them in their entirety, and protects a broad swath of the President's advisors and their respective staffs. There is no indication in the record, or ever asserted by Advocates, that some random person not covered by one of the three privileges received or viewed any of the withheld documents. While an understandable concern, there is no basis for such a view in this case.

the various records played in his decisions. Advocates feel this is necessary in order to assess which privileges might, or might not, apply. As noted above, while specificity is always better for the requesting party, the Court must weigh the competing privacy interest. Where, as here, all the documents at issue are essentially the same, it is not unusual that the descriptions of each document are essentially the same as well. While Advocates see the generic nature of the descriptions as vague and lacking, any more specificity could negate the whole reason for withholding the documents in the first instance. Specifics in a *Vaughn* index could just as easily lead to the dissemination of information to the public that was the impetus for the withholding in the first instance.[7]

In summary, DOJ has carried its burden. The *Vaughn* index and accompanying affidavit explains with sufficient detail how the information withheld "logically falls within the claimed exemptions, and [] that the justifications are not controverted by contrary evidence in the record or by evidence of [] bad faith." *Hunt v. C.I.A.,* 981 F.2d 1116, 1119 (9th Cir. 1992). The Court accepts DOJ's *Vaughn* index.

The Court next turns to the three privileges DOJ claims are at issue and justify withholding of the records under FOIA Exemption 5.

2. *Presidential Communications Privilege*

"The [presidential communications] privilege covers documents reflecting presidential decisionmaking and deliberations, regardless of whether the documents are

---

[7] Additionally, by Advocates own admission, it knows the general substance and purpose of the withheld records (as DOJ released 26 similar records to them already) and in fact, can possibly even ascertain which monuments were at issue in those records using a process of elimination.

predecisional or not, and it *covers the documents in their entirety*." *Loving v. Dep't of Def.*, 550 F.3d 32, 37-38 (D.C. Cir. 2008) (emphasis added) (internal citation and quotation marks omitted). The privilege "preserves the President's ability to obtain candid and informed opinions from his advisors and to make decisions confidentially." *Id.* at 37. It applies to "documents or other materials that reflect presidential decisionmaking and deliberations and that the President believes should remain confidential." *In re Sealed Case*, 121 F.3d 729, 744 (D.C. Cir. 1997).

The privilege "applies to communications made in the process of arriving at presidential decisions," *New York Times Co. v. U.S. Dep't of Def.*, 499 F. Supp. 2d 501, 516 (S.D.N.Y. 2007) (quoting *In re Sealed Case*, 121 F.3d at 745), and also protects "communications 'in performance of a President's responsibilities,' . . . 'of his office,' . . . and made 'in the process of shaping policies and making decisions.'" *Amnesty Int'l v. C.I.A.*, 728 F. Supp. 2d 479, 522 (S.D.N.Y. 2010) (quoting *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977)).

In addition to direct communications with the President, the privilege shields "communications that [presidential] advisers and their staff . . . solicit and receive in the course of performing their function of advising the President on official government matters." *In re Sealed Case*, 121 F.3d at 752. The application of the privilege to advisors who have "broad and significant responsibility for investigating and formulating the advice to be given to the President" reflects "the need for confidentiality to ensure that presidential decision-making is of the highest caliber, informed by honest advice and full

knowledge." *Judicial Watch, Inc. v. Dep't of Justice,* 365 F.3d 1108, 1114, 1116 (D.C. Cir. 2004) (internal citation and quotation marks omitted).

It appears undisputed that the F&L Memos and the File Memoranda were provided to the President and/or senior presidential advisers in response to requests for advice regarding the legality of proposed presidential actions—actions over which the President held final decision-making authority. In fact, Advocates do not take issue with this analysis. Rather, Advocates contend that the presidential communications privilege only extends to quintessential Article II powers and is not applicable in this case because DOJ did not produce these records to fulfill any of the President's Article II duties, but instead for the President's statutory duties under the Antiquities Act of 1906.

Advocates pull this interpretation from the same cases cited by DOJ that explain the privilege itself. While the presidential communications privilege in those cases was invoked in relation to Article II powers, that does not necessarily mean that the opposite is not true, i.e. that the privilege does not equally apply to communications regarding non-Article II duties. In fact, at oral argument, Advocates conceded that they could not cite any case that stands for the proposition that the presidential communications privilege is only limited to core powers. Advocates correctly note that the Supreme Court has yet to address this issue because no case has presented facts in which a party is asserting the privilege outside of the Article II context. For all of these reasons, Advocates urge the Court to construe the privilege narrowly, limit it to only core Article II powers, and not allow DOJ to rely upon it in this case.

DOJ relies upon *United States v. Philip Morris USA, Inc.*, for the proposition that the presidential communications privilege is not as limited as Advocates assert. No. CIV.A. 99-2496 (GK), 2004 WL 3253662, at *2 (D.D.C. Sept. 9, 2004). Advocates distinguish *Philip Morris* by noting that in that case, the United States District Court for the District of D.C. rejected the distinction the parties were trying to make between whether the presidential power at issue was delegable or non-delegable. Advocates claim that is different from its argument here because it is not seeking to distinguish between the delegation of duties, but between the source of the power behind the duty—i.e. whether the power comes from Article II or a statute. This difference aside, the Court finds the *Philip Morris* Court's analysis instructive.

In *Philip Morris*, the Defendants, like Advocates here, relied upon *In re Sealed Case* and *Judicial Watch,* and argued that because both of those landmark presidential communications privilege cases involved "quintessential, non-delegable Presidential function[s]" such characteristics were a "requirement for application of the privilege." *Id.* at *1. The Court rejected this position for three reasons. The Court will quote at length from the *Philip Morris* Court's decision because the analysis regarding the "delegable" distinction argument in *Philip Morris* applies to Advocates "source of power" distinction argument in this case. In other words, a substitution of the word "Article II" in place of "delegable" (bolded below) leads to a similar outcome.

> First, there is absolutely no language in either *In re Sealed Case* or *Judicial Watch* to suggest that their holdings turned on the fact that a non-**delegable** power was in question.
> …

> If the Court of Appeals intended to limit the scope of the privilege in the manner Joint Defendants suggest, it would have clearly spelled out such limitation in setting forth the standard for its application. While the presence of non-**delegable** powers in both cases may have made the case for application of the privilege particularly strong—because the communications were, by definition, tied to presidential decisionmaking—there is nothing to suggest that it was a *sine qua non* of application of the privilege rather than a mere coincidence.
>
> …
>
> Second, limiting the privilege to only those communications regarding non-**delegable** powers would undermine the very purposes for which it exists. The privilege "is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *United States v. Nixon,* 418 U.S. 683, 708 (1974); *see In re Sealed Case,* at 743, 745.
>
> …
>
> Thus, restricting the scope of the privilege to only those communications to which the President (or his White House advisors) was a direct participant or to communications regarding a non-**delegable** power would eviscerate its purpose and limit the President's ability to rely on his advisors to develop candid recommendations on many of the matters directly related to the duties of his office.
>
> …
>
> Finally, the Court of Appeals explicitly rejected the distinction between **delegable and non-delegable** Presidential functions which the Joint Defendants now urge, reasoning that such a distinction "draws an arbitrary line, for it provides no reason to conclude that presidential decisions that could have been delegated, but were not, are entitled to less candid or confidential advice than those that could not have been delegated at all." *Judicial Watch,* at 1123.

*Philip Morris*, 2004 WL 3253662, at *2. These three reasons are apropos in this case as well. Like the defendants in *Philip Morris*, the cases cited by Advocates have dealt primarily with Article II powers; however, there is nothing to suggest that is a limiting feature of the privilege rather than coincidence. Second, restricting the presidential communications privilege to Article II powers would draw an arbitrary line—a line

without legal basis at this point and "undermine the purpose for which [the privilege] exists." *Id.*

Aiding the Court in this decision is the fact that other district courts have likewise not limited the presidential communications privilege to communications regarding quintessential Article II powers, but have applied it to a multitude of communications, documents, and circumstances. *See*, *e.g.*, *Elec. Frontier Found. v. Cent. Intelligence Agency*, ("EFF") No. C 09-3351 SBA, 2013 WL 5443048, at *20 (N.D. Cal. Sept. 30, 2013) (applying the presidential communications privilege to quarterly reports from the Intelligence Oversight Board and Office of the Director of National Intelligence generated pursuant to Executive Order 13462); *Amnesty Int'l,* 728 F. Supp. 2d at 522-23 (concluding that the presidential communications privilege applies to documents containing CIA's recommendations relating to detainee policies and decisions to be made by the President); *Loving,* 496 F. Supp. 2d at 107 (holding the presidential communications privilege applied to transmittal memos from the Secretaries of Army and Defense containing court-martial death sentence recommendations requiring presidential approval); *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Homeland Sec.,* No. CIV. 06-0173 (RJL), 2008 WL 2872183, at *3 (D.D.C. July 22, 2008) (applying the presidential communications privilege to documents regarding FEMA's response to Hurricane Katrina); *New York Times Co.,* 499 F. Supp. 2d at 516 (holding that an email from an attorney in the White House Counsel's Office seeking the Attorney General's comments on a draft presidential radio address was properly withheld under the presidential communications privilege); *Berman v. CIA*, 378 F.Supp.2d 1209, 1218-22

(E.D. Ca. 2005) (applying the presidential communications privilege to the CIA's Daily Presidential Briefs).[8]

Following an extensive review of all available caselaw on the subject, this Court is inclined to agree with these numerous district courts, and in the absence of persuasive authority to the contrary, finds that the presidential communications privilege is not limited only to quintessential Article II powers and that DOJ has properly invoked this privilege in this case. To be clear, there is no doubt that the presidential communications privilege applies to communications directly related to the President's Article II Powers; but the privilege is not so restrictive—as Advocates assert—that it cannot likewise apply to the records at issue in this case.

DOJ provided the ten F&L Memos to senior presidential advisors in an effort to assist with presidential decision making and deliberations. The communications memorialized in the two File Memoranda were likewise legal advice given to the President's senior advisors. While the power vested in the President in this particular circumstance came from a statute, rather than Article II, there is no binding legal authority that restricts the privilege on that basis alone. The presidential communications privilege therefore applies and the Court will not require DOJ to turn over the 12 records.

---

[8] Many of these cases do not discuss whether the power at issue is an Article II power or a statutory power. While it may be clear that an Article II power is at issue in some cases involving Commander in Chief duties (*Amnesty Int'l* and *Loving* for example), the same cannot be said for a case involving FEMA (*Citizens for Responsibility & Ethics in Washington*), a radio broadcast (*New York Times*), or reports generated pursuant to an executive order (*EFF*).

As the presidential communications privilege applies to these documents in their entirety, the Court's inquiry could end here. However, two other privileges apply in this case which the Court will briefly discuss.

### 3. *Deliberative Process Privilege*

FOIA Exemption 5 incorporates a privilege known as the deliberative process privilege, s*ee EFF,* 739 F.3d at 4, the intent of which is "to embody an executive privilege with contours broad enough to protect the deliberative and decision-making processes of government." *Conoco Inc. v. U.S. Dep't of Justice,* 687 F.2d 724, 727 (3d Cir. 1982); s*ee also*, *Klamath Water Users*, 532 U.S. at 8-9 ("[O]fficials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news."); *N. L. R. B. v. Sears, Roebuck & Co.,* 421 U.S. 132, 150 (1975) ("[T]hose who expect public dissemination of their remarks may well temper candor with a concern for appearances . . . to the detriment of the decisionmaking process." (internal quotation marks omitted)); *Assembly of State of Cal.,* 968 F.2d at 920 (finding the purpose of the deliberative process privilege "is to allow agencies freely to explore possibilities, engage in internal debates, or play devil's advocate without fear of public scrutiny").

To fall within the deliberative process privilege, a document must be both (1) "predecisional," that is to say, "generated before the adoption of an agency's policy or decision," and (2) "deliberative," meaning that it contains opinions, recommendations or advice about agency policies. *FTC v. Warner Commc'n, Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984) (citing *Coastal States*, 617 F.2d at 866); *Assembly of State of Cal.*, 968 F.2d at

920. A communication is "predecisional" when it is "prepared in order to assist an agency decisionmaker in arriving at his decision." *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184 (1975). A communication is "deliberative" when it reflects the "give-and-take that occurs among agency members in the formulation of policy." *Nat'l Wildlife Fed'n v. U.S. Forest Serv.*, 861 F.2d 1114, 1117 (9th Cir. 1988).

Legal advice, no less than other types of advice, "fits exactly within the deliberative process rationale for Exemption 5." *Brinton v. Dep't of State*, 636 F.2d 600, 604 (D.C. Cir. 1980); *see also EFF,* 739 F.3d at 9 (holding that the deliberative process privilege covers legal memoranda that concern the advisability of a particular policy, but does not authoritatively state or determine the agency's policy); *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980) (recognizing that a "series of memoranda to the Assistant Secretary of the Army from the General Counsel . . . recommending legal strategy" is a "classic case of the deliberative process at work"); *Citizens for Responsibility & Ethics in Wash.,* 249 F.R.D. at 5-7 (finding OLC legal advice memorandum that "does not represent the Executive Branch's final decision on [a] question" is properly withheld under the deliberative process privilege).

It is apparent that the oral legal advice now memorialized as File Memoranda records 1 and 10 is predecisional and deliberative. Advocates do not dispute this fact. However, Advocates do claim that the F&L Memos are not predecisional or deliberative, but rather the final position of the DOJ and therefore not covered by the deliberative process privilege.

Advocates posture that F&L Memos are not advisory in nature. This reading comes from Executive Order 11,030, now codified as 1 C.F.R. § 19.2, which outlines how proposed Executive Orders or Proclamations are routed and approved. In relevant part, 1 C.F.R. § 19.2(b) directs that once the Office of Management and Budget (OMB) approves a proposed order, it (the OMB) transmits the proposal to the "Attorney General for his consideration as to both form and legality." The Attorney General ("AG") has delegated this duty to OLC. *See* 28 U.S.C. § 0.25(b). Subsection (c) goes on to state that "[i]f the Attorney General approves" of the proposed order, he will pass it on to the Director of the Office of the Federal Register. 1 C.F.R. § 19.2(c). Finally, subsection (e) states that if any of the reviewers (including the AG) disapproves of the proposal "it shall not thereafter be presented to the President unless it is accompanied by a statement of the reasons for such disapproval." 1 C.F.R. § 19.2 (e).

Advocates interpret these various provisions to mean that OLC, via the AG, have the final say on the proposed orders and that if it (OLC) disapproves, such disproval "halts any further processing of the proposal." Dkt. 8-2, at 10. This simply is not true. If OLC (on behalf of the AG) approves of the form and substance of a proposal, then it moves on to the next agency. But even if the AG (or in this case OLC) does not approve of the proposal, there is still the possibility that it will go to the President. Advocates rely on the clause "shall not thereafter be presented to the President . . ." from subsection (e) to support its position. This reading completely disregards the qualifying end to that sentence, which states that proposals shall not be presented "*unless* it is accompanied by a statement of the reasons for such disapproval." 1 C.F.R. § 19.2 (e). In other words,

OLC's form and legality review could produce a memo of non-approval and the proposal could still be presented to the President, it simply would have to be accompanied by an explanation of why OLC did not give its approval.[9] In short, Advocates interpretation of 1 C.F.R. § 19.2 in support of its position that the F&L Memos are not advisory, but rather final, is misplaced.

Additionally, while the F&L Memos may be a quasi-final *position* of OLC as it relates to its job in advising the President and other top officials, it is by no means a final *policy* of DOJ or OLC. The F&L Memos are not policy, but rather opinions, recommendations, and advice. Non-approval of a proposal, and the reasons therefore, may be just as important as approval, as the core function of OLC and DOJ is to act as legal advisor to the President and other departments and agencies within the Executive Branch. As Paul Colborn points out in his declaration, providing such advice on difficult and unsettled questions of law, involving matters that can be quite complicated or controversial, is a core component of OLC's mission. *Colborn Decl.,* Dkt. 12-3, ¶¶ 5, 26. For the President and Executive Branch officials to robustly and freely deliberate and perform their duties effectively, OLC must be able to give candid legal advice not constrained by concerns about public disclosure. Similarly, Executive Branch

---

[9] This language in subsection (e) does slightly contradict subsections (b) and (c), which seem to indicate that the Director of Management and Budget and the AG only pass the proposal on to the next approver in the first place if it has their approval. However, subsection (e) also seems to indicate that disapproval is an option and the workaround to get it to the next stage—and eventually the President—is that the sender must provide an appropriate explanation. 1 C.F.R. § 19.2.

policymakers should not feel inhibited from seeking OLC's candid and frank legal advice for fear of subsequent disclosure.

In *Electronic Privacy Information Center v. Department of Justice*, 584 F. Supp. 2d 65, 76 (D.D.C. 2008) [hereinafter "*EPIC*"], the plaintiffs put forth the same argument as Advocates have asserted regarding the finality of OLC's F&L Memos. The *EPIC* court determined that such a narrow reading was inappropriate, stating that "if legal opinions are disclosable simply because they are authoritative or conclusive, this 'would mean that virtually all legal advice OLC provides to the executive branch would be subject to disclosure.'" *Id.* (quoting *CREW v. Office of Admin.*, 249 F.R.D. 1, 6 (D.D.C. 2008)). The plaintiffs in *EPIC* cited the same cases Advocates cite here for the proposition that an agency must disclose all conclusive legal opinions. The *EPIC* court soundly rejected this interpretation of those prior cases and noted that "neither case stands for the unilateral proposition that an agency's conclusive interpretations of law are always "final opinions" for purposes of FOIA." *Id.* Consistent with *EPIC*, this Court will similarly reject such a narrow interpretation of the deliberative process privilege.

Finally, both sides seem to be trying to split a fine hair in regard to the definition of "predecisional." Advocates argue that, in order for a document to be predecisional, an agency needs to generate the document prior to publication or disclosure of that agency's policy or decision and, since the F&L Memos are OLC's policy or decision, they are not predecisional. DOJ, on the other hand, postures that the documents are predecisional because OLC prepares them for the President in preparation for *his* final decision on a given matter. The Court agrees with the later interpretation. As has been discussed, OLC

does not set policy. Even if an F&L Memo could be considered OLC's position on a given matter, such a conclusion would be the result of the specifics of the proposal in question. It does not follow that a single F&L Memo becomes the position of OLC indefinitely. Presumably, OLC's "policy" is to follow the law and advise the Executive Branch on the same. Each F&L Memo—and the legal advice therein—would fit the contours of the questions presented, and not necessarily reflect how OLC would treat a similar question in the future under different factual circumstances, new or changed laws, or a different administration.

OLC's F&L Memos were not final policies, but predecisional and deliberative in nature. OLC drafted these memos for the purpose of giving advice, recommendations, and opinions on pending proposals and orders to the President and other senior officials within the Executive Branch. DOJ has appropriately invoked the deliberative process privilege with regard to these memos.

### 4. Attorney-Client Privilege

The attorney-client privilege protects confidential communications between a client and his or her attorney made for the purpose of obtaining or providing legal assistance. *See U.S. v. Richey*, 632 F.3d 559, 566 (9th Cir. 2011); *Andrus v. Dep't of Energy*, 200 F. Supp. 3d 1093, 1106-07 (D. Idaho 2016) (citation omitted). The purpose of this privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 360 (3rd Cir. 2007) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). It operates in the

government context in the same manner. *See, e.g.*, *In re Cnty. of Erie*, 473 F.3d 413, 418 (2d Cir. 2007); *accord U.S. v. Martin,* 278 F.3d 988, 999 (9th Cir. 2002).

In order to justify the withholding of documents under the attorney-client privilege, a government agency must "show that these documents involved the provision of specifically *legal* advice [and] that they were intended to be confidential and were kept confidential." *Nat'l Res. Def. Council v. U.S. Dep't of Def.*, 388 F. Supp. 2d 1086, 1104 (C.D. Cal. 2005) (citation omitted).

The record in this case makes clear that the F&L Memos—true to their name—contained legal advice about the form and legality of proposals and the File Memoranda memorialize legal advice OLC orally provided to the President and his senior advisors. *See Colborn Decl.*, Dkt. 12-3, ¶¶ 14, 17, 21-22, 27. Additionally, OLC based its legal advice in the memoranda on information that was provided to OLC in confidence for the purpose of seeking legal advice. *Id.*, ¶¶ 14, 17, 27. OLC is the Executive Branch's legal counsel and it deserves the same protections a single client would expect from his or her attorney. DOJ properly withheld all records as exempt attorney-client communications under Exemption 5.

With this determination, the Court has concluded that all three separate privileges apply to the withheld documents. That being said, Advocates argue that even if the Court finds that DOJ has established that the deliberative process and attorney-client privileges apply in this case, the F&L Memos have lost their protections under the "working law" and "adoption" doctrines. The Court will address each counter-argument in turn.

5. *Working Law Doctrine*

Federal courts have recognized a narrow exception to the deliberative process privilege for documents that constitute an agency's "working law." *See New York Times Co. v. U.S. Dep't of Justice,* 872 F. Supp. 2d 309, 317 (S.D.N.Y. 2012). This exception applies *only* to documents that would otherwise be exempt under the deliberative process privilege. *See Am. Civil Liberties Union of N. Cal. v. U.S. Dep't of Justice,* 880 F.3d 473, 489 (9th Cir. 2018). This privilege does not apply to documents withheld under the presidential communications privilege. *See Am. Civil Liberties Union v. Nat'l Sec. Agency*, No. 13CIV09198KMWJCF, 2017 WL 1155910, at *12 (S.D.N.Y. Mar. 27, 2017). In regards to whether it applies to the attorney-client privilege, DOJ cites to numerous cases that question this proposition. *See Am. Civil Liberties Union of N. Cal.*, 880 F.3d at 489 ("No similar rationale justifies extending the working law exception to the attorney work-product privilege as incorporated in Exemption 5."), *with New York Times Co. v. U.S. Dep't of Justice*, No. 17-CV-00087 (CRC), 2017 WL 4772406, at *5 (D.D.C. Oct. 20, 2017) ("The Court is aware of no case that has ever applied the "working law" exception to abrogate the attorney client privilege"). Advocates, on the other hand, argue that this doctrine is in fact applicable to the attorney-client privilege. Advocates argument is based upon the assumption that a document has been incorporated into an agency's policy or otherwise does not fall within the deliberative process privilege. As outlined above, the Court finds that DOJ properly invoked the deliberative process privilege in this case. Advocates position on this topic is, therefore, all but moot. Both parties' positions regarding whether the working law exception applies to the

attorney-client privilege are tenuous at best. However, the Court does not need to reach a determination on this issue as the working law doctrine fails in this case for two independent reasons.

First, even if the Court did find that this doctrine could abrogate both the deliberative process and attorney-client privileges, the presidential communications privilege, which the Court has already determined DOJ properly invoked in this case, would shield the records from disclosure.

Second, this doctrine is unavailing on the merits as the Court has also already determined that the F&L Memos (the only documents for which this doctrine would apply) do not represent the policy of the department (i.e., the "working law"), but are rather deliberative and predecisional. As noted, although one could consider the F&L Memos OLC's final position as to the specific question at issue, the memos themselves are not formal agency policy. In a similar vein, the F&L Memos are not transformed into the "working law" of the agency simply because they might constitute controlling, precedential, authoritative, or final statements of the legal constraints on the President's decisions. *See EFF*, 739 F.3d at 9-10; *see also Campaign of Accountability v. U.S. Dep't of Justice*, 2017 WL 4480828, at *13-14 (D.D.C. Oct. 6, 2017).

The D.C. Circuit in *EFF* declined to extend the working law doctrine to OLC memos drafted for the Federal Bureau of Investigation:

> Even if the OLC Opinion describes the legal parameters of what the FBI is *permitted* to do, it does not state or determine the FBI's policy. The FBI was free to decline to adopt the investigative tactics deemed legally permissible in the OLC Opinion. Indeed, the OIG's report acknowledged that the FBI had "declined . . . to rely on the authority discussed in the OLC Opinion."

> The OLC Opinion does not provide an authoritative statement of the FBI's policy. It merely examines policy options available to the FBI. Therefore, the OLC Opinion is not the "working law" of the FBI.

*EFF*, 739 F.3d at 10 (internal citations omitted). Stated another way, OLC legal advice does not necessarily reflect the adopted policy of the agency that requests it. *Campaign for Accountability*, 2017 WL 4480828, at *14 (citing *EFF*, 739 F.3d at 9). Other district courts have made similar findings, specifically in the context of memos drafted to aid the President:

> OLC memoranda, do not constitute "working law." They are not an expression of final agency policy because they are advisory and cannot bind the President in his decisionmaking. Moreover, the OLC is an agency that does not make final decisions or create "agency law." Rather than creating law, the OLC provides nonbinding legal opinions to decisionmakers in the executive branch that have no operative effect within the OLC or on substantive rights or liabilities of the public in general.

*Samahon v. U.S. Dep't of Justice*, No. CIV.A. 13-6462, 2015 WL 857358, at *23 (E.D. Pa. Feb. 27, 2015).

In this case, the F&L Memos contained legal advice and recommendations for the President. The Memos themselves did not constitute the working law of the DOJ even though they do reflect the DOJ's best judgment on a particular issue. Likewise, the F&L Memos did not bind the President, nor become the working law of the particular proposal at issue. The F&L Memos exempt status under the deliberative process privilege remains intact and the working law doctrine does not apply.

### 6. Adoption Doctrine

The protection of the deliberative process privilege may be lost "if an agency chooses expressly to adopt or incorporate by reference" a memorandum that would have

otherwise been protected by the privilege. *Sears*, 421 U.S. at 161. As with the working law doctrine, the adoption doctrine, if proven, would only abrogate the deliberative process privilege and the attorney-client privilege. So again, because the Court has concluded that the presidential communications privilege applies, there really is no need to go any further. However, as before, this doctrine likewise fails on the merits, as the argument is misplaced.

"The touchstone of the express adoption inquiry is whether the agency uses the reasoning contained in a document, and the authority provided by the document, to 'justify' its actions to the public." *New York Times Co. v. U.S. Dep't of Justice*, 138 F. Supp. 3d 462, 475 (S.D.N.Y. 2015). In order for the adoption exception to apply, it must be evident that "the reasoning in the [deliberative document] is adopted by the [agency] as *its* reasoning;" it is not sufficient for adoption that the agency "agrees with the conclusion." *EFF*, 739 F.3d at 10 (quoting *Grumman*, 421 U.S. at 169).

Advocates argue that the process outlined in 1 C.F.R. § 19.2 for receiving OLC's F&M memos "effectively commits the executive branch to OLC's determinations." Dkt. 8-2, at 18. As discussed above, this is a misreading of the statute. The AG or the Director of OMB can disapprove of any order and it can still go to the President—just not without an accompanying explanation. Furthermore, ever if the AG approves of a proposal's form and legality, the President may elect not to move forward on a proclamation or order for countless reasons. Just because OLC approves a proposal does not mean that the proposal will ever see the light of day.

Specific to the facts of this case, Advocates have not provided any evidence that would show adoption has taken place in relation to the 12 records at issue. There is no indication that the President adopted the withheld memoranda or publicly disclosed their contents. One could infer that the President and his advisors had accepted the conclusions of a particular F&L Memo based on the subsequent issuance of a Presidential proclamation or order. However, that does not mean that the President incorporated the reasoning from any of these memoranda. The President could have moved forward with a proclamation or order for any number of reasons, in light of, or in spite of, OLC's recommendations. Thus, DOJ's asserted privileges withstand this doctrine as well.

### 7. *Segregability Doctrine*

As a final request, Advocates argue that even if the Court determines the documents are privileged and that DOJ can continue to withhold them, the Court should nonetheless release certain portions of the documents under the doctrine of segregability. Specifically, Advocates ask the Court to sever the F&L Memo cover letters.

Under FOIA, the government must disclose "any reasonably segregable portion of a record . . . after deletion of the portions which are exempt." 5 U.S.C. § 552(b). Before approving an agency's assertion of a FOIA exemption, therefore, "the district court must make specific findings of segregability regarding the documents to be withheld." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007); *see also ACLU of N. Cal. v. DOJ*, 880 F.3d 473, 487 (9th Cir. 2018).

As with the two previous doctrines, DOJ argues that if the presidential communications privilege applies, it applies to the withheld documents in their entirety

and there is no need to address this argument. Nevertheless, the Court will discuss an additional reason for withholding. As Colborn points out in his declaration, ""[a]lthough the attached cover letters do not themselves contain legal advice, their disclosure would reveal the titles of the relevant proclamations, and accordingly would reveal which proclamations were subject to this additional confidential legal advice." *Colborn Decl.*, Dkt. 12-3, ¶ 25.

Advocates feel this explanation is unpersuasive because the cover letters in question contain similar, if not identical, information as the cover letters DOJ already produced. As for the name of any monument, Advocates do not believe that is a good enough reason to withhold the cover letters because "that fact is already known. Pursuant to Executive Order 11,030, *all* presidential proclamations are submitted to OLC for legal approval." Dkt. 15, at 19. This appears to be an inaccurate statement. While all proclamations or orders that become official were no doubt submitted to OLC for review, that does not mean that all proposals submitted to OLC for review become official. That is the purpose of the process. The President may have chosen, upon receipt of OCL's F&L Memos, to discard a proposal for any number of reasons. The public would most likely never know about these proposals. Thus, even the name of a monument on the cover letter could give away information never intended to become public knowledge.

Here, it is clear that DOJ does not want the public to know the contents of these specific F&L Memos, nor does it even want the Court to undertake an *in camera* review. There are multiple valid reasons, some of which have been discussed above, for why this might be the case. Simply put, these documents contain legal advice and are protected

under three separate privileges from disclosure and, while the cover letters themselves may not contain legal advice, they are part of the memos and may contain sensitive information that DOJ, or the President, do not want revealed. The presidential communications privilege protects the whole document from disclosure, and because the Court has found that DOJ properly invoked this privilege, the Court will not sever or segregate the cover letters from the rest of the withheld documents.

## V. CONCLUSION

Advocates argue that (1) DOJ has not meet its burden in providing an appropriate *Vaughn* index, (2) the presidential communications privilege does not apply as the powers at issue were not Article II powers, and (3) that certain actions taking by DOJ (and others) waived DOJ's other asserted privileges. The Court has reviewed the applicable case law and, under the facts presented, cannot agree.

DOJ's *Vaughn* index, coupled with the affidavit of Paul Colborn is sufficient to put Advocates on notice and preserve the adversarial process. DOJ has persuasively explained what the withheld records are. Even without the specific recipients or name of the monument at issue, the Court can determine that all the records contain legal advice to the President and his advisors and should remain protected. While public disclosure is an important and necessary part of any free society, so too is candor and privacy when those at the highest levels of government strive to determine the best course of action.

The privileges asserted in this case stand. The presidential communications privilege is not limited to Article II powers and protects these documents in their entirety. The deliberative process privilege and attorney-client privilege also apply. The working

law and adoption doctrines do not apply or negate DOJ's privileges. Lastly, the Court will not segregate any of the requested records. DOJ's reliance upon the three privileges under FOIA Exemption 5 stand. DOJ has properly withheld the 12 records in this case and the Court will not require it to turn over any of the protected material to Advocates.

## VI. ORDER

IT IS HEREBY ORDERED:

1. The Department of Justice's Motion for Summary Judgment (Dkt. 12) is **GRANTED.**

2. Advocates for the West's Motion for Summary Judgment (Dkt. 8) is **DENIED.**

3. The Court will enter a separate Judgment in accordance with Fed. R. Civ. P. 58.

DATED: August 6, 2018

David C. Nye
U.S. District Court Judge